WEIGHT WATCHERS
INTERNATIONAL,
INC., Plaintiff,

v.

The STOUFFER CORPORATION,
Stouffer Foods Corporation and
Nestle Enterprises, Defendants.

STOUFFER FOODS CORPORATION,
Counterclaim–Plaintiff,

v.

WEIGHT WATCHERS INTERNATION-
AL, INC., H.J. Heinz Company and
Foodways National, Inc., Counter-
claim–Defendants.

No. 88 Civ. 7062 (MBM).

United States District Court,
S.D. New York.

Aug. 30, 1990.

As Amended Oct. 12, 1990.

William R. Hansen, Bert A. Collison, Ronald J. McGaw, Nims, Howes, Collison & Isner, New York City, Robert J. Hollweg, Weight Watchers Intern., Inc., Jericho, N.Y., for plaintiff/counterclaim-defendants.

Robert V. Vickers, Body Vickers & Daniels, Cleveland, Ohio, Mary Lee Pilla, Nestle Enterprises, Inc., Solon, Ohio, Paul Fields, Ira J. Levy, Darby & Darby, New York City, for defendants/counterclaim-plaintiff.

## OPINION AND ORDER

MUKASEY, District Judge.

Whether or not the late Duchess of Windsor was right when she postulated that one can never be too rich or too thin,[1] one certainly can get rich these days by holding out the promise to make others thin. The parties to this action hold out that promise, and clash in pursuit of those riches.

Plaintiff Weight Watchers International, Inc. markets both a diet program and a line of frozen low calorie foods. Plaintiff's diet program, as set forth in greater detail below, employs a system of six food groups (bread, fruit, protein, fat, milk and vegetable) in specified quantities, called exchanges. Defendant Stouffer Foods Corporation manufactures and markets a line of low calorie frozen foods under the name "Lean Cuisine." Beginning in 1987, Stouffer launched an advertising campaign aimed primarily at those who follow the Weight Watchers program. The ads listed what were said to be Weight Watchers exchanges for Stouffer's Lean Cuisine entrees that would enable Weight Watchers adherents to use Lean Cuisine entrees in their Weight Watchers diets. In communications to those who followed its diet program, Weight Watchers disputed the accuracy of the Lean Cuisine ad campaign. This lawsuit followed, with Weight Watchers asserting trademark infringement and both sides leveling charges of deception and unfair trade practices.

Because the Stouffer ads in question were misleading or inaccurate in certain limited respects, they are enjoined for the

---

1. *See* Rose, *Fasting Girls: The Emergence of Anorexia Nervosa as a Modern Disease; Book Review,* The Atlantic, July, 1988; Laderman, *Wall Street's Newest Problem: Too Much Money,* Business Week, Aug. 1, 1988, at 80.

reasons and to the extent described below, although Stouffer certainly will be able to use the Weight Watchers name in accurate, non-confusing compatibility advertising. The Stouffer claims against Weight Watchers are without substance and are dismissed.

Weight Watchers filed this suit in October, 1988 against The Stouffer Corporation, and later amended the complaint to include as defendants Nestle Enterprises, Inc. and Stouffer Foods Corporation. Plaintiff alleges trademark infringement, false advertising and unfair competition in violation of the Lanham Act, and state law claims of unfair competition, dilution and deceptive trade practices arising out of an advertising campaign for Stouffer Food Corporation's Lean Cuisine line of frozen entrees, including ads in 1987, 1988 and 1989. Plaintiff seeks an injunction prohibiting defendants from using the mark "Weight Watchers" in connection with any diet-related exchange information, or from stating or implying that defendants' products fit into or are interchangeable with plaintiff's diet program or exchanges. Plaintiff seeks the profits defendants earned from the advertising at issue as well as costs of suit.

Defendant Stouffer Foods Corporation filed counterclaims against Weight Watchers, H.J. Heinz Company and Foodways National, Inc., alleging deceptive and unfair trade practices and false advertising in violation of the Lanham Act, as well as state law claims of unfair competition, intentional interference with sale and injurious falsehood. Counterclaim-plaintiff asks for compensatory and punitive damages against counterclaim-defendants, as well as declaratory relief and costs.

From February 26, 1990 to March 7, 1990 the parties tried the case to the court. This opinion contains the findings and conclusions from the evidence at that trial.

I.

A. *The Parties*

Weight Watchers International is a corporation organized under the laws of Virginia, with its principal place of business in Jericho, New York. (Compl. ¶ 2) Weight Watchers was founded in 1963 by Jean Nidetch, a woman who resolved to lose weight but was unable to do so until she discovered that group support for her weight loss efforts provided the needed catalyst for shedding pounds. She met with a group of overweight friends in her living room in Little Neck, Long Island, and they were so successful at losing weight that soon Nidetch was leading groups in her neighborhood. The groups became a business, and over the next 15 years the business expanded across the globe; by 1978, Weight Watchers had franchises all over the world and 500,000 members per week attending meetings worldwide. (Tr. 31–32)

In 1978, the H.J. Heinz Co. bought Weight Watchers (Tr. 32); four months earlier, Heinz had acquired Foodways National, Inc., a licensee of Weight Watchers which produced frozen foods under the Weight Watchers brand name. (Tr. 56–60) Weight Watchers receives a licensing fee from the sale of Weight Watchers brand frozen food based upon a percentage of sales. (Tr. 97) Foodways is not the only Weight Watchers licensee; other companies—particularly Heinz USA, another subsidiary of H.J. Heinz Co.—produce Weight Watchers brand products such as yogurt, salad dressing, condiments and mixes. (Tr. 104)

Sales of Weight Watchers brand frozen entrees manufactured by Foodways rose from $90 million in fiscal 1982 to over $300 million in fiscal 1989. (PX 66) Also by 1989, sales of the Weight Watchers diet program topped $230 million (Tr. 33), with membership averaging over 600,000 people per week in the United States. (Tr. 33)

Weight Watchers International, H.J. Heinz Co. and Foodways National are all counterclaim-defendants in this case.

Named defendants The Stouffer Corporation (TSC) and Nestle Enterprises, Inc. (NEI) are Ohio corporations with their principal places of business in Solon, Ohio. Defendant and counterclaimant-plaintiff Stouffer Foods Corporation is a Pennsylva-

nia corporation with its principal place of business in Solon, Ohio. TSC owns the registered trademarks "Lean Cuisine" and "Stouffer's." (Tr. 1357)

Stouffer Foods has manufactured and marketed food products since 1946, but it did not introduce the line of frozen entrees at issue here, called Lean Cuisine, until 1981. (PX 66, Tr. 371) By 1982, Lean Cuisine surpassed Weight Watchers frozen entrees in total sales, and by 1983 was selling over twice the volume of the Weight Watchers brand. (PX 66) According to a chart introduced by Weight Watchers, Lean Cuisine's sales started dropping in 1985, and in 1988 were even with Weight Watchers' sales. (PX 66) Since then, Weight Watchers and Stouffer have been competing closely and ferociously for market share.

■ Defendants assert that this court lacks personal jurisdiction over TSC and NEI. (Answer ¶¶ 53–57) Plaintiff tries to connect NEI with this case on the basis of Nestle Enterprises' ownership of Stouffer and Stouffer Food Corporation, and the alleged involvement of Nestle Chairman James Biggar in approving the Stouffer Foods Corporation advertisement at issue. Because there is no clear legally cognizable evidence that Biggar approved any of the ads at issue, and there is no other evidence of other connections between NEI and this case, plaintiff's claims against Nestle Enterprises are dismissed.

■ The Stouffer Corporation is more closely tied with Stouffer Foods Corporation, and there is clear evidence that by the middle of 1988, management at TSC knew about Weight Watchers' displeasure with the ads at issue and Weight Watchers' objections to the use of exchange information in these ads, and that they negotiated this dispute with Weight Watchers management. (Tr. 1186) In letters to Weight Watchers' Director of Legal Affairs, TSC's Senior Vice President and General Counsel and Secretary, James Ball, described the history of the Lean Cuisine ad campaign targeted toward Weight Watchers members, discussed exchange information, showed an in-depth knowledge of the ads at issue here, and pointed out Weight Watchers' own shortcomings. (PX 64A, 64B) These letters were written well before the 1989 advertisement was published, and thus indicate that TSC at the very least knew about the advertisements and probably was directly involved in the publishing of such ads. Therefore, The Stouffer Corporation is not dismissed as a defendant in this lawsuit.

## B. *The Weight Watchers Program*

The Weight Watchers weight loss program has four parts: the food plan, the exercise plan, the self-discovery plan and group support. (Tr. 194) The self-discovery plan teaches members to recognize the situations which trigger overeating and to modify their behavior; group support, as the name suggests, provides encouragement from others for each member's weight loss efforts. (PX 85) It is only the food plan, however, that is at issue in this case. Group leaders stress five keys to the food plan: daily totals and weekly limits on what members can eat; exchange lists, which allow members to choose certain amounts of food from each of six food groups; so-called "lifestyle options," which allow members to individualize the program; menu planners; and checklists which members must fill out to keep track of what they eat. (Tr. 197–98) These elements are interrelated and support the basic mandate of limiting food intake.

A food "exchange" is an approximation of the caloric value of foodstuffs in a given portion size. (Tr. 1108) The exchange element of the food plan is designed to ensure that members eat a well-balanced array of foods and consume them in proper amounts. The system of food exchanges largely obviates the need for counting calories, a process that has two drawbacks: first, it is difficult and often confusing for laypeople; second, if pursued without attention to the nutrient content of food, it can lead to an unbalanced and unhealthful diet. Instead, the exchange system assures that members consume the allotted number of food exchanges of the six designated food exchange categories.

In Week One of the Weight Watchers program, a new member receives a booklet containing six exchange lists. They are for fruits, vegetables, fats, protein, bread, and milk. Weight Watchers explains an exchange list as a group of foods with similar caloric and nutrient content. (PX 86–A at 3) An exchange is one food item in the amount listed. Foods on the same exchange list may be selected interchangeably to fulfill that day's quota for that particular food group. (*Id.*) For example, in the first week, a woman must consume 2 to 3 fruit exchanges, at least 3 vegetable exchanges, 3 fat exchanges, 5 to 6 protein exchanges, 2 bread exchanges, and 2 milk exchanges per day.[2] Amounts are somewhat different for men and teenagers. (*Id.* at 1)

In addition to the exchanges, members are allotted a certain number of "optional calories" each week—that is, an allowance of calories members can "spend" by eating certain foods over and above the exchanges allotted for each day or week. (See, e.g., PX 86–A at 3). During the first week of the program, a member may spend 150 optional calories on foods listed on "options lists" in the Weight Watchers booklets. These optional calorie foods include limited quantities of cocoa, honey, ketchup, jam, or extra amounts of foods listed under the exchanges. Each week for the next four weeks of the program, the exchange lists are expanded to include more food options and the optional calorie allowance is expanded to 500 calories.[3]

The program also places weekly limits on specific foods which are high in calories, fats and cholesterol, such as eggs, hard or semisoft cheese, beef, lamb or pork, and organ meats. (PX 86–A at 6) These foods fall under the "protein" exchange categories; when they are ingredients in Weight

Watchers products, their presence is specially noted in parentheses so members know that they are consuming "limited exchanges." (DX JG) Further, although members are allowed unlimited vegetable exchanges, no more than one of these vegetable exchanges per day may be fulfilled by eating tomato products or juices. (PX 86–E at 5)

The concept of using food group "exchanges" in diet plans did not originate with Weight Watchers. Exchanges simplify a meal planning system by reducing calorie intake while at the same time providing easy values that a dieter can remember without having to count calories. (Tr. 1109) Dieticians for many years have used food exchanges in their work; a dietician, by examining a recipe and nutritional information for a commercial food product, can assign exchange values to the product to allow its use in a diet program. (Tr. 1111–12) The system of exchanges the dietician uses may vary depending upon the goal of the diet—that is, whether the diet is meant for weight loss or to limit certain foods for medical reasons. (Tr. 1108) But exchange values used in weight loss diets are similar, whether they are set by Weight Watchers or other dieticians. The American Dietetic and American Diabetic Associations (ADA) publishes exchange lists for foods, meant to be used by people with diabetes and people on weight loss programs; these exchange categories are quite similar to the ones used by Weight Watchers. (DX LK, LL, LM) The ADA has been using the exchange concept and providing exchange lists to nutritionists and dieticians for many years, and in fact used the term "exchange" before Weight Watchers did. (DX LK at 060438) Stouffer lists ADA ex-

---

**2.** For example, to fulfill the daily total for fruit exchanges, a member could select from a variety of fruit exchanges listed in the Week One booklet, including one small apple, ½ medium banana, one small orange, one cup of strawberries, and ½ cup of orange juice, among other choices. (*Id.*) To meet her intake requirements under the bread exchange list, she could choose two items from among a list of entries including a one-ounce slice of bread, ¾ oz. of cold cereal,

3 tbsp. of flour, and ½ board of matzo, among other choices. (*Id.*)

**3.** For instance, on Week Three, grapes are added to the fruit exchange list, so that a member can fulfill a fruit exchange with either 20 small grapes or 12 large ones. (PX 86–C at 1) By Week Five, if a member chooses, she could use up to 500 calories on alcoholic beverage, chocolate, or cookies. (Pl.Exh. 86–E at 8)

changes for each Lean Cuisine entree on the product's box.

In 1984, Weight Watchers developed a new diet program called Quickstart, which was designed to help members lose weight faster by further reducing their calorie intake in the first few weeks. (Tr. 46–47) It was at this time that Weight Watchers formally adopted the system of "exchanges"; prior to that, it used other terms such as "servings." (Tr. 615) Stouffer alleges that one of the primary objectives of Weight Watchers' new food plan and its optional calories was to sell more Foodways frozen meals and to discourage members from buying competitors' frozen diet meals. Although there is no evidence that the new plan was meant to hinder competition, there is evidence that Weight Watchers changed the diet in response to Foodways' concern that in the first two weeks of that plan members could not eat most of Foodways' frozen meals. (DX ES, EQ)

When Weight Watchers first showed the plan to Foodways, Foodways strenuously objected to the new plan because of the short lead time Weight Watchers gave Foodways to change its products, and because the plan limited use of Foodways entrees; an intramural dispute between the two Heinz-owned companies ensued. (DX ES, EV) As a result, Weight Watchers changed the plan to include "optional calories." This system of optional calories allowed members to use almost all Weight Watchers brand products even at the beginning of the diet. (DX EQ, ES, ET, Tr. 122–128)

It is evident that since the Heinz takeover, the Weight Watchers program has been somewhat influenced by the interest of Heinz, including its subsidiaries, to sell low calorie products. Nevertheless, Stouffer's contention that this undisclosed influence constitutes misrepresentation by Weight Watchers is absurd. The primary goal of Weight Watchers is still to help its members lose weight, and Stouffer has presented no evidence to the contrary. Indeed, there is no evidence that Weight Watchers followed suggestions by Foodways to instruct Weight Watchers group

leaders to push Weight Watchers frozen meals at group meetings (Tr. 131), although group leaders do hand out information and coupons for Weight Watchers food products at these meetings. (Tr. 131–132)

### C. Frozen Food and the Weight Watchers Program

Each box of Weight Watchers brand frozen entrees lists the Weight Watchers exchanges for that entree. These exchanges are calculated by Weight Watchers' manager of license operations, Allen Ho. Ho also supervises Weight Watchers' quality control of Foodways and other licensees' products. (Tr. 620–622; 643–45) Ho testified at trial that he calculates exchanges in consultation with the nutrition department based upon published program information given to Weight Watchers members and leaders, and other "guidelines"—some in his head and some written down—that govern the calculation of exchange values for ingredients used specifically in processed food, such as preservatives, flavorings and texturizing ingredients. (Tr. 622–624; 630–634) As discussed below, in Section III of this opinion, Ho's decisions, based on undisclosed criteria, seem in some instances to be arbitrary.

### D. Stouffer's Advertisements

When Stouffer Food Corporation launched its Lean Cuisine product line in 1981, it began to offer by mail booklets listing ADA exchanges and Weight Watchers exchanges for Lean Cuisine entrees. (DX G, H, I, J, K; Tr. 803–804) In 1987, Stouffer attempted to schedule an advertisement in Weight Watchers magazine, but the magazine rejected the advertisement. (DX JK; Tr. 805–806) In June and September 1987, Stouffer ran an advertisement in *Parade* magazine with the headline "LEAN CUISINE ENTREES PRESENT 25 WAYS TO GET MORE SATISFACTION FROM YOUR WEIGHT WATCHERS PROGRAM," and a smaller headline: "WEIGHT WATCHERS EXCHANGES FOR LEAN CUISINE ENTREES." (PX 9; Tr. 807) Below these headlines, and taking up most of the space in the ad, were pic-

tures of Lean Cuisine entree boxes for each of the 25 entrees. Under the picture of each box, Weight Watchers exchange information was listed. At the very bottom of the ad, in small print, Stouffer placed the disclaimer: "Weight Watchers is a registered trademark of Weight Watchers International, Inc. The exchanges provided here are based solely on published Weight Watchers exchange information and do not imply approval or endorsement of those exchanges or of LEAN CUISINE entrees by Weight Watchers International, Inc." A dotted line broken by the phrase "clip here" framed the perimeter of the advertisement. This configuration suggests the ad was meant to be cut out and affixed to a wall, bulletin board or perhaps by magnets to a refrigerator door, where it could be consulted in aid of selecting a Lean Cuisine frozen entree.

In June, 1987, Weight Watchers sent a "Flash Bulletin" to its North American franchisees alerting them to the claim that Lean Cuisine fits into the Weight Watchers program, and emphasizing that group leaders should respond to any questions about this ad by saying that "we only stand behind Weight Watchers products and any claims by other products cannot be substantiated. We do not dispute or confirm claims by other companies. Stouffer's Lean Cuisine remains a separate company with no affiliation to Weight Watchers." (DX BC) This statement echoes a section of the Weight Watchers guide for group leaders. (DX BC)

In January 1988, Stouffer ran a slightly different advertisement in *Parade* magazine. (Tr. 815) This one declared in different typeface: "Stouffer's presents Weight Watchers exchanges for all 28 Stouffer's Lean Cuisine entrees." (PX 10) As in the previous ad, the boxes were depicted with the Weight Watchers exchange information below each, and a dotted line framed the pictures of the boxes and most of the copy. The disclaimer in this advertisement, although slightly larger than in the previous ad, was printed below the line where consumers were supposed to cut out the advertisement.

Also in January, 1988, Stouffer conducted a direct mail campaign in which it sent a letter, a copy of the 1988 Lean Cuisine advertisement (PX 10) and a coupon to Weight Watchers members. (PX 11; DX BD)

In April, 1988, Charles Berger, the President and Chief Executive Officer of Weight Watchers, sent a letter to all Weight Watchers members describing the 1988 Lean Cuisine ad, and advising members that:

"First, we want you to know that Weight Watchers did not sponsor or otherwise cooperate in this advertisement.

Second, you should be advised that Stouffer's has incorrectly represented the 'Weight Watchers Exchanges.' In no instance has Optional Exchange Information been listed, although this is indicated by the ingredients stated on the package. Similarly, Fat Exchange and Vegetable Exchange information is omitted in certain cases. Also, certain Limited Vegetable Exchanges and Protein Exchanges are not identified.

As you should be aware, Weight Watchers does not review or otherwise provide Exchange Information for commercially prepared branded food products such as Stouffer's Lean Cuisine entrees.

The only Exchange Information which we do provide and stand behind is that on Weight Watchers brand products...." (DX BT)

In February, 1989, after this litigation already had commenced, Stouffer ran a third advertisement; this one ran in newspapers and carried a coupon and the headline, "Stouffer's presents exchanges for all 35 Lean Cuisine items to fit into your Weight Watchers program." (PX 14, 15) The exchanges for these products again were listed under each picture, although these exchanges were more detailed, and included footnotes showing "limited meat" choices, semisoft/hard cheese and tomato paste/puree. The same disclaimer was printed, although in this ad it appeared inside the dotted line marking where to cut out the ad.

## II.

Weight Watchers owns six registrations for its mark "Weight Watchers," which is used on and in connection with frozen food products, dry foods, a magazine, and as a service mark for the weight loss program discussed above. (PX 2–8)

Weight Watchers bases its trademark infringement and unfair competition claims on §§ 32 and 43(a) of the Lanham Act, and also brings a false advertising claim under § 43(a) of the Act. 15 U.S.C. §§ 1114(1) and 1125(a). Because Weight Watchers has registered its "Weight Watchers" trademark, it may rely upon § 32(1)(a) of the Act, *see Cuisinarts, Inc. v. Robot–Coupe Intern. Corp.*, 509 F.Supp. 1036, 1041 (S.D.N.Y.1981), which provides in pertinent part:

"(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; ... shall be liable in a civil action by the registrant for the remedies hereinafter provided...."

15 U.S.C. § 1114(1). Section 43(a) of the Lanham Act makes actionable both false designation of origin and false advertising.[4] 15 U.S.C. § 1125(a). The same facts which substantiate an action for trademark infringement under § 32 will support a claim for false designation of origin or sponsorship under § 43(a). *See Thompson Medi-*

cal Co., Inc. v. Pfizer Inc., 753 F.2d 208, 213 (2d Cir.1985); *Cuisinarts*, 509 F.Supp. at 1042.

### A. Strength of the Mark

In analyzing whether plaintiff has proved trademark infringement or unfair competition under § 43(a), it is helpful as a threshold matter to examine how much protection the mark at issue deserves.[5] *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir.1986).

"Weight Watchers" is a registered trademark. When a mark is registered under the trademark laws, the mark is "presumed to be distinctive and should be afforded the utmost protection." *Lois Sportswear*, 799 F.2d at 871 (citing *Vibrant Sales, Inc. v. New Body Boutique, Inc.*, 652 F.2d 299, 304 (2d Cir.1981), *cert. denied*, 455 U.S. 909, 102 S.Ct. 1257, 71 L.Ed.2d 448 (1982)). Proof of secondary meaning is not required when a plaintiff brings a claim for infringement of a registered trademark. *Thompson Medical Co.*, 753 F.2d at 216 n. 14.

### B. Likelihood of Confusion

A trademark holder establishes a *prima facie* case of trademark infringement or unfair competition by demonstrating that the allegedly infringing use of its trademark is likely to confuse consumers as to the source of the product. *Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.*, 832 F.2d 1311, 1314 (2d Cir.1987); *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). The Lanham Act was

---

**4.** Section 43 of the Lanham Act provides that:

"Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(2) in commercial advertising or promotion, misrepresents the nature, characteristics, quali-

ties, or geographic origin of his or her or another person's goods, services or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act." 15 U.S.C. § 1125(a).

**5.** Stouffer argues that Weight Watchers International has abandoned the trademark "Weight Watchers" by licensing it to related companies. The evidence shows, however, that Weight Watchers has retained control over the nature and quality of the trademarked items, (Tr. 620–22; 643–45), and therefore has not abandoned the mark. *See Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358 (2d Cir.1959).

designed to prevent consumers from becoming confused as to either: (1) "the relationship between the trademark holder and a competitor seeking to use that trademark or a substantially similar mark in its own marketing efforts," or (2) the source of the product. *Home Box Office*, 832 F.2d at 1314. The Act was meant also to prevent a competitor from free-riding on a trademark owner's goodwill and reputation. *See Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1342 (2d Cir.1975), *quoted in Lois Sportswear U.S.A., Inc.*, 799 F.2d at 872.

Therefore, the confusion requirement should not be read too narrowly; in "order to be confused, a consumer need not believe that the owner of the mark actually produced the item and placed it on the market.... The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204–05 (2d Cir. 1979). Plaintiff therefore will satisfy the confusion requirement if it proves that defendant's use of plaintiff's mark confused consumers as to plaintiff's association with or endorsement of defendant's product. *See Lois Sportswear*, 799 F.2d at 872; *Consumers Union of U.S. v. General Signal Corp.*, 724 F.2d 1044, 1052 (2d Cir. 1983), *cert. denied*, 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984).

Likelihood of confusion is usually measured by applying the test formulated by Judge Friendly in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). This test examines the strength of the mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap between his product and the alleged infringer's, actual confusion, the defendant's good faith, the quality of defendant's product, and the sophistication of the buyers. *Polaroid*, 287 F.2d at 495. The *Polaroid* test, however, is not a rule or rigid formula, but rather is a useful guide to help measure the likelihood of confusion that must be

applied with due regard for the "peculiar circumstances" of each case. *Lois Sportswear*, 799 F.2d at 872.

■ This case is peculiar in relation to the *Polaroid* test, because that test was developed to judge likelihood of confusion when determining "how far a valid trademark shall be protected with respect to goods other than those to which its owner has applied it...." *Polaroid*, 287 F.2d at 495. Here, defendant did not use plaintiff's trademark to designate its own product, but instead used it in "compatibility" advertising, or advertising about the product's fit with a competitor's product or service. Such compatibility advertising is similar to comparative advertising in that it provides useful information to consumers. So, for example, a competitor may use another's trademark when providing information about the substitutability of products because by doing so the "supplier engages in fair competition based on those aspects—for example, price—in which the products differ." *American Home Products v. Barr Laboratories*, 656 F.Supp. 1058, 1068 (D.N.J.), *aff'd*, 834 F.2d 368 (3d Cir.1987). The Lanham Act thus does not prohibit all unauthorized use of a trademark. "Trademarks of a rival company can be used in competitive advertising, so long as the advertising 'does not contain misrepresentations or create a reasonable likelihood that purchasers will be confused as to the source, identity, or sponsorship of the advertiser's product.'" *Cuisinarts, Inc.*, 509 F.Supp. at 1042 (quoting *Smith v. Chanel, Inc.* 402 F.2d 562, 563–64 (9th Cir. 1968)).

In cases alleging trademark infringement in comparative advertising—usually based on preliminary injunction hearings rather than full-fledged trials—judges in this circuit have evaluated the likelihood of confusion on their own by looking at the facial ambiguity of the advertisements, as well as proof of actual confusion such as consumer surveys, to determine whether such confusion is likely. *See Home Box Office*, 832 F.2d 1311; *Cuisinarts, Inc.*, 509 F.Supp. at 1043. *See, e.g., Consumers Union*, 724 F.2d 1044 (§ 43(a) claim).

Based upon the *Polaroid* test and upon the facial ambiguity of the first two advertisements at issue in this case, there is a considerable likelihood that the 1987 and 1988 advertisements (PX 9, 10), would cause confusion as to Weight Watcher's endorsement or sponsorship of, or affiliation with, the Lean Cuisine products, and thus infringe Weight Watchers' trademark. But there is not such a likelihood that the most recent advertisement (PX 14, 15) would cause confusion, and thus it does not infringe Weight Watchers' trademark.

### 1. *The Polaroid Factors*

The first *Polaroid* factor, strength of the mark, supports plaintiff's claim. As discussed above, "Weight Watchers" is a registered mark, which is presumed to be distinctive. Further, absent trademark registration, strength of mark is determined by classifying marks in ascending order as: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976). If the mark is generic, it is not entitled to protection even with proof of secondary meaning; if the mark is descriptive, it is entitled to protection upon proof of secondary meaning; and if the mark is suggestive or arbitrary, it is entitled to protection even absent proof of secondary meaning. *Paper Cutter, Inc. v. Fay's Drug Co., Inc.*, 900 F.2d 558, 561–62 (2d Cir.1990). Plaintiff has presented ample evidence that the "Weight Watchers" mark is a strong one; not only is it suggestive rather than descriptive, but Weight Watchers food products and the Weight Watchers diet have enjoyed such success over the past 25 years that the secondary meaning attached to the mark is indisputable. *See Papercutter, Inc.*, 900 F.2d at 564.

Stouffer proffers the affirmative defense that it did not use the phrase "Weight Watchers" as a trademark or service mark, but rather to describe or identify, in good faith, the diet plan or company "Weight Watchers." (Answer ¶ 46) Defendant seems to argue also that the phrase "Weight Watchers Exchanges" is different from the phrase "Weight Watchers," and thus cannot be excluded from use. (Answer ¶ 58) Indeed, plaintiff cannot preclude all uses of the "Weight Watchers" trademark, but this does not prevent the phrase from being a trademark. Defendant itself seems to concede that "Weight Watchers" is a well-known name identifying the brand and diet plan by using the mark in its advertisement to try to attract Weight Watchers members to Lean Cuisine frozen foods.

The second factor, proximity of products, also weighs in favor of plaintiff. Stouffer's Lean Cuisine brand competes directly with Weight Watchers brand frozen entrees; in fact, some of the entrees featured in the Lean Cuisine advertisements even have the same names as Weight Watchers' frozen entrees.[6] (See PX 10; DX IV) The third factor, bridging the gap, is irrelevant; Stouffer's Lean Cuisine and Foodway's Weight Watchers products occupy the same market.

The fourth factor, actual confusion, will be discussed in subsection 2 below.

The fifth *Polaroid* factor, defendant's intent in using plaintiff's mark, favors neither plaintiff nor defendant. There is no evidence that defendant meant to cause confusion as to endorsement or sponsorship by Weight Watchers;[7] the purpose of the

---

**6.** Both brands make Chicken Cacciatore, Pepperoni French Bread Pizza, Cheese French Bread Pizza and Deluxe French Bread Pizza. They also make entrees with similar names: *e.g.*, there is a Lean Cuisine "Breast of Chicken Parmisan," and a Weight Watchers "Breaded Chicken Patty Parmigiana."

**7.** Plaintiff claims that a market research study that Stouffer commissioned in 1987 to examine consumers' recall of the first Stouffer ad in *Parade* magazine indicated confusion and thus alerted Stouffer early on that the ads would

cause consumer confusion. (DX CQ) But the researchers' findings revealed that when readers of the magazine were asked if they recalled seeing any advertisements in that issue, 5 percent recalled a Lean Cuisine ad, while 1 percent recalled a Weight Watchers ad. Then, the researchers asked those who did not remember a Lean Cuisine ad if they recalled seeing an ad for a lower calorie frozen dinner, and 14 percent recalled a Lean Cuisine ad, while 3 percent recalled a Weight Watchers ad. Finally, for those who still did not recall a Lean Cuisine ad,

advertising campaign was to reach Weight Watchers members and convince them to eat Lean Cuisine by listing purported Weight Watchers exchanges, not to imply that Weight Watchers endorsed Lean Cuisine. (Tr. 808–09) Although Stouffer did intend to take advantage of Weight Watchers' goodwill by using the Weight Watchers trademark, *see Grotrian, Helfferich, Schulz,* 523 F.2d at 1342, this is not a case of copying, in which awareness of a party's registered mark could signal bad faith. *See Centaur Communications v. A/S/M Communications,* 830 F.2d 1217, 1227–28 (2d Cir.1987). Rather, Stouffer's intent to use the Weight Watchers trademark in a compatibility advertisement cannot weigh in favor of plaintiff here regardless of Stouffer's purposeful exploitation of the Weight Watchers trademark, because unlike instances of purposeful copying, compatibility ads are meant to convey product information useful to consumers if conveyed accurately.

The sixth *Polaroid* factor, the quality of defendant's product, is not relevant here. Although the parties no doubt would strenuously disagree, I do not find that one product is superior in quality to the other; both reach the same market and sell in the same price range.

Finally, the last *Polaroid* factor examines the sophistication of buyers. Allegedly, less sophisticated buyers spend less time examining the product and thus are more likely to be misled or confused. *See McGregor–Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1137 (2d Cir.1979). Plaintiff argues that the general public is not knowledgeable about "exchanges," and thus the reference to exchanges in the advertisement is likely to confuse consumers about the connection between Weight Watchers and Stouffer. Plaintiff argues also that because the price of the products is low, consumers spend less time considering the

purchase and are more likely to become confused between the two products.

These arguments are valid when applied to people who are not Weight Watchers members or are otherwise not knowledgeable about diet programs and foods. But those people are also less likely to be potential consumers of diet foods, and as to more sophisticated buyers, the sophistication factor can cut the other way. The advertisement is targeted toward (Tr. 808–09) and would catch the attention of Weight Watchers members (DX CQ at 11), who not only are quite sophisticated about the exchange system and their knowledge about food products, but are likely to spend time considering their food purchases and figuring out whether these purchases can fit into their diet program. Other people who buy low calorie frozen food also are likely to be on diets or watching their weight, and thus more careful and knowledgeable about the foods they buy. Therefore, potential buyers of the product are less likely to be confused.

On the other hand, Weight Watchers members are the people who are most vulnerable to defendant's use of the Weight Watchers mark. Their mistaken belief that Weight Watchers endorses Lean Cuisine products would be most likely to prompt them to buy Lean Cuisine frozen foods. Therefore, an advertisement could confuse sophisticated buyers no matter how long they contemplate their purchases if the advertisement confuses them about a subject that constitutes part of their "sophistication."

Although the sophistication-of-the-buyers factor here cuts both ways, I find that because the ad was specifically geared toward Weight Watchers members—who know from what they hear at Weight Watchers meetings that Stouffer and Weight Watchers are not connected, and who are likely to read the fine print of an

the researchers named four specific brands. Plaintiff argues that because 16 percent of those surveyed thought they saw a Weight Watchers ad, Stouffer knew of possible confusion, and thus ran the ad campaign in bad faith. But 20 percent of those surveyed thought they saw a Budget Gourmet Slim Line advertisement in

that magazine, and 12 percent thought they saw a Classic Lite advertisement. Thus, the survey did not necessarily alert Stouffer to possible confusion over a specific ad, but merely demonstrated that many consumers do not remember the ads they have seen, and confuse, in an abstract way, various diet frozen entrees.

advertisement that lists exchanges for frozen entrees, particularly when, as in the 1989 ad, that fine print is a part of the ad they are supposed to clip and save, and when that print is at least as prominent as the exchanges themselves—this factor favors defendant. But this does not mean, as discussed below, that the first two ads do not use the Weight Watchers mark in a manner confusing enough to befuddle both Weight Watchers members and ordinary impulsive consumers.

### 2. *Actual Confusion*

#### (a) *Market Research Surveys*

The "actual confusion" factor was one of the major battlegrounds in this case, and both sides commissioned experts to conduct consumer surveys to test whether the Stouffer advertisements engendered confusion. As might be expected, each side's expert on market research came to a conclusion that disfavored the other: Weight Watchers' survey found confusion, while Stouffer's survey revealed no confusion. Both surveys contained serious methodological flaws discussed below. Consequently, I accord plaintiff's survey slight weight, with strong misgivings about its improper universe and improper miscategorization of responses. I accord no weight to defendants' survey, which was designed to reveal no confusion no matter how confusing the ad at issue actually was.

■ While a survey may establish likelihood of confusion, the survey must " 'have been fairly prepared and its results directed to the relevant issues.' " *Universal City Studios v. Nintendo Co., Ltd.,* 746 F.2d 112, 118 (2d Cir.1984) (quoting *National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc.,* 532 F.Supp. 651, 657 (W.D.Wash.1982)). The criteria for the trustworthiness of survey evidence are that: (1) the "universe" was properly defined; (2) a representative sample of that universe was selected; (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner; (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted; (5) the data gathered was accurately reported; (6) the data was analyzed in accordance with accepted statistical principles and (7) objectivity of the entire process was assured. *Toys R Us, Inc. v. Canarsie Kiddie Shop, Inc.,* 559 F.Supp. 1189, 1205 (E.D.N.Y.1983). A court may place such weight on survey evidence as it deems appropriate, and many courts have ignored such evidence when it does not meet the criteria. *See Universal Studios,* 746 F.2d at 118; *Coca–Cola Co. v. Tropicana Products, Inc.,* 690 F.2d 312, 317 (2d Cir.1982); *Inc. Pub. Corp. v. Manhattan Magazine, Inc.,* 616 F.Supp. 370, 390–94 (S.D.N.Y. 1985), *aff'd,* 788 F.2d 3 (2d Cir.1986); *American Home Products,* 834 F.2d at 371.

■ At trial, plaintiff introduced three market research studies—one for each Lean Cuisine ad—overseen by William Weilbacher, a former advertising research executive and the president of Bismark Corporation, a marketing and advertising consulting firm. (PX 82) Plaintiff introduced reports summarizing the method and findings for each of the studies (PX 27A–C), questionnaires both for screening respondents and asking the main questions (PX 28B, 29B, 30B), survey coding materials (PX 27–AA, 27–BA, 27–CB, 27–CC, 27–CD), and reports validating respondents' participation in the survey. (PX 28–A, 29–A, 30–A) In this study, participants were approached in shopping malls and asked preliminary questions to determine whether they qualified for the "universe" of the survey. The universe of the Weight Watchers surveys was defined as women between the ages of 18 and 55 who have purchased frozen food entrees in the past six months and who have tried to lose weight through diet and/or exercise in the past year. (PX 27–A, 27–B, 27–C, Tr. 235)

The Weilbacher studies did not limit the universe to consumers who had purchased a *diet* frozen entree (Tr. 269), or who had tried to lose weight through diet as opposed to exercise; therefore, some of the respondents may not have been in the market for diet food of any kind, and the study universe therefore was too broad. Sloppy

execution of the survey broadened the universe further when interviewers mistakenly including participants who did not qualify even under Weilbacher's standards. For example, on some of the qualifying surveys, not all of the questions qualifying participants for the universe were answered; therefore, it is impossible to discern whether the respondent fit within the defined universe. (Tr. 342–351; PX 28–B, 29–B, 30–B) Flaws in a study's universe quite seriously undermine the probative value of the study, because to "be probative and meaningful ... surveys ... must rely upon responses by potential consumers of the products in question." *Dreyfus Fund Inc. v. Royal Bank of Canada*, 525 F.Supp. 1108, 1116 (S.D.N.Y.1981), *quoted in Universal Studios, Inc.*, 746 F.2d at 118. *See also Inc. Pub. Corp.*, 616 F.Supp. at 393. Respondents who are not potential consumers may well be less likely to be aware of and to make relevant distinctions when reading ads than those who are potential consumers. The ability to make relevant distinctions is crucial when what is being tested is likelihood of confusion.

Further, the results of plaintiff's market study overstated actual confusion as to source or endorsement engendered by the advertisement by testing for any "connection" between Stouffer or Lean Cuisine and Weight Watchers in consumers' minds after reading the ad. Interviewers first asked participants to look at three different print advertisements, one of which was the Lean Cuisine ad, and identify who sponsored the advertisement and why the person thinks so. Then, they told participants to look again at the Lean Cuisine ad, and to determine whether "you think there is any connection between Stouffers Lean Cuisine and Weight Watchers, or not?" If participants found a connection, they were asked to describe the connection.

In analyzing the responses, Weilbacher divided the connections seen by respondents into 6 categories: (1) there is a business connection between the two companies; (2) "the ad connects them—Stouffer's 'presents' Weight Watchers"; (3) Stouffer's used the Weight Watchers exchanges; (4) Stouffer's products are interchangeable with Weight Watchers; (5) both products are diet foods; (6) all other single mentions. (PX 27–C at 085491; 27–B at 085006; 27–A at 080007) Therefore, although the study relating to the 1989 advertisement found that 63.5 percent of respondents saw a connection between Stouffer's Lean Cuisine and Weight Watchers, Weilbacher found that 13.2 percent of total respondents saw a "business connection" between the two companies.

Only the "business connection" category shows confusion as to source or endorsement, and thus only this category is relevant to plaintiff's infringement claim. Some of the responses which Weilbacher placed within that category, when examined individually, do not show such confusion. For example, in the survey for the 1989 ad, Weilbacher categorized 24 respondents in Pittsburgh as having found a business connection, but only 13 individual responses, allegedly taken down verbatim, seem to indicate a confusion as to the relationship between Weight Watchers and Stouffer or Lean Cuisine. (PX 27–C at 085492–93) Weilbacher reports that 16 respondents from Providence who allegedly saw a business connection; I agree only as to 13. (PX 27–C at 085493–94) As to the other 39 respondents, from Portland–Vancouver and Forth Worth, I agree with Weilbacher's categorizations in only 29 cases. (PX 085494–97) Therefore, after examining the individual responses to the Weilbacher survey, I find that only 9.2 percent of respondents were confused as to endorsement, sponsorship or source after reading the 1989 advertisement.

In his other studies, Weilbacher found that 14.7 percent, or 22 out of 150 respondents thought there was a business connection after reading the 1987 ad. (PX 27–B at 085006) I found only 8.6 percent, or 18 out of 150 respondents, who indicated that they saw such a connection. Weilbacher found that 17.7 percent, or 54 out of 305 respondents inferred such a connection from the 1988 advertisement. (PX 27–A at 080007) I found that 15.1 percent, or 46 of these respondents, saw a business connection.

Plaintiff argues that in Lanham Act cases, courts sometimes have relied on relatively small showings of actual consumer confusion to find likelihood of confusion and thus infringement. *See Grotrian, Helfferich, Schulz, etc. v. Steinway and Sons*, 365 F.Supp. 707, 716 (S.D.N.Y.1973), *aff'd* 523 F.2d 1331 (2nd Cir.1975) (7.7 percent business connection and 8.5 percent name confusion); *RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1061 (2d Cir. 1979) (15 to 20 percent consumer confusion); *McDonald's Corp. v. McBagel's, Inc.*, 649 F.Supp. 1268, 1277 (S.D.N.Y.1986) (24.8 percent confusion). In these cases, however, at least 15 percent of consumers were confused as to source or endorsement, while here, at least as to the 1989 advertisement, the study shows 9.2 percent confusion. More important, however, is that even accurate and probative market research does not conclusively decide the issue of likelihood of confusion in Lanham Act cases. *See McBagel's, Inc.*, 649 F.Supp. at 1278; *Worthington Foods, Inc. v. Kellogg Co.*, 732 F.Supp. 1417, 1446 (S.D. Ohio 1990). Here, the flaws in plaintiff's market research methods lead me to accord very little weight to the results, *see Universal Studios, Inc.*, 746 F.2d at 118, and therefore such results do not affect my conclusion that as to the 1989 advertisement, there is little likelihood of confusion.

The market study conducted for defendants in this case has even less probative value. It is obvious that Dr. Jacob Jacoby, a veteran of the trademark litigation arena and the creator of the Stouffer survey,[8] constructed the study specifically to disprove consumer confusion regardless of participants' reactions to the advertisements. Jacoby's study focused on confusion as to the goal or source of the advertisement, but did not focus upon confusion as to endorsement from the message in the advertisement; as the study report itself explains, "[t]he basic objective of this investigation was to determine whether … respondents would incorrectly identify Weight Watchers as the product-service being advertised or as the source of the Lean Cuisine advertisement." (DX MJ at 4)

Respondents first were screened for membership in the universe, which Jacoby defined as including both males and females, aged 18 to 55, who in the past six months either bought frozen food meals or snacks for themselves or someone else in their household, ate any frozen meal or snack, or were involved in selecting the brand of frozen foods used in their household. The survey excluded those who worked in certain industries, people who normally wore eyeglasses but did not have the glasses with them, and people who had participated in a market research study in the past three months. (DX MJ at 8) As with the Weilbacher survey, the universe here does not focus upon people who ate diet or low-calorie frozen foods or even people who were trying to lose weight through dieting. Although the screener questionnaire did contain a question asking whether respondent had eaten frozen food as part of a plan to lose weight, this question was not used to narrow the universe for the study as a whole.[9] Although the universe was thus flawed, that was not the main problem with the study. The study's two major shortcomings were its failure to focus on the kind of confusion that was at issue in this case, and its use of "control" advertisements supposedly to show that consumers were generally confused about advertisements and thus to justify disregarding most confusion as irrelevant "noise."

**8.** This is not the first time Jacoby's survey findings have been criticized. *See American Home Products*, 656 F.Supp. at 1070; *Worthington Foods, Inc.*, 732 F.Supp. at 1446. Similarly, Weilbacher's studies also have previously been criticized by courts. *See Coca–Cola Co. v. Tropicana Products, Inc.*, 538 F.Supp. 1091, 1094–95 (S.D.N.Y.1982), *aff'd,* 690 F.2d 312 (2d Cir.1982).

**9.** In his report, Jacoby mentions that 52 of those sampled had eaten frozen foods as part of a plan to lose weight, and that 6 of these, or 11.5 percent, were classified as confused. This finding is interesting considering that in the over-all sample, Jacoby found that 9 percent of respondents were confused about the Lean Cuisine ad; therefore, it would seem from his study that, although it sounds unlikely, a higher percentage *of people familiar with frozen diet food were* confused.

In the main part of the study, participants were shown three different advertisements, including the 1989 Stouffer ad mentioning Weight Watchers. The two other advertisements also involved two products each: one seemed to be jointly sponsored by Japan Airlines and AT & T, proclaiming that a JAL ticket will get you to Tokyo in about 14 hours, while an AT & T card will get you back to the U.S. in about 14 seconds; (DX MJ App. A) the second was a comparative advertisement showing that Now cigarettes have 3 mg. of tar while Carlton 100's cigarettes have 5 mg. of tar. (DX MJ App. A) After being shown each advertisement, participants were asked what product or service was being advertised; when respondents did not know, the interviewer asked whose product or service was advertised, and when respondents did know, the interviewer asked who placed the ad. As to the Lean Cuisine ad, which was always shown last, the interviewer asked in addition whether the respondent noticed the name "Weight Watchers" in the ad, and whether or not the name Weight Watchers meant anything to the respondent. (DX MJ App. B)

The confusion which the study attempted to record, therefore, related to whose products were being advertised and who placed the ad. The study did not consider the possibility that consumers would know that Stouffer or Lean Cuisine placed the ad, while also thinking that Lean Cuisine and Weight Watchers were part of the same company, cooperating, or endorsing each other's products. Although Jacoby tried to mitigate this problem by adding extra questions about the Lean Cuisine ad, these questions did not focus upon the use of the name "Weight Watchers" in the ad, but seemed designed to elicit the respondent's perception of Weight Watchers in general, wholly apart from the advertisement.

Further, although Jacoby found in his study that 9 percent of the respondents were confused as to the Lean Cuisine ad, Jacoby used the control ads to "adjust for noise factors (such as guessing) and the level of confusion that might be expected when these particular respondents would look at any ad. When this adjustment is made, it can be seen that the level of confusion that can be attributed to the Lean Cuisine ad is essentially zero." (DX MJ at 24) The problem with this method is that it assumes that the existence of confusion in these other ads sets a constant or permissible level of confusion which an ad mentioning more than one product must exceed in order to be actionable. Not only is this an incorrect assumption, but it also assures a party's control over the study's outcome by use of the control ads.

Jacoby's theory of "noise" is based upon his previous research on miscomprehension of communications, where he found that in general, 15 to 23 percent of people tested miscomprehend magazine advertisements.[10] (Tr. 1237) But in the study at issue, Jacoby eliminated "noise" based upon high confusion over the control ads, at least one of which—the JAL/AT & T ad—was in fact extremely confusing as to source, sponsorship and endorsement. It is not surprising that when shown an advertisement that seemed to promote both JAL tickets and AT & T, 31.8 percent of respondents were confused, or that when shown an ad comparing two kinds of cigarettes, stating merely that one was "lowest," 32.7 percent of respondents, many of whom may well have been non-smokers, were confused. Confusion responses were deceptively higher for control ads than for the Lean Cuisine ads also because respondents all had eaten or had helped choose frozen meals, but did not necessarily smoke or use long distance services, and thus were more sophisticated

**10.** In *Quality Inns Intern., Inc. v. McDonald's Corp.,* 695 F.Supp. 198 (D.Md.1988), Jacoby conducted a survey for Quality Inns to show lack of confusion over the company's proposed "McSleep Inn" hotels. The court, finding a certain amount of confusion, wrote that "[b]oth experts acknowledged that there are inherent distortions in surveys which they call 'noise.' But none estimated that the extent of this noise would ever rise above a few percentage points." *Quality Inns Intern., Inc.,* 695 F.Supp. at 219. That finding seems to contradict Jacoby's testimony here.

and knowledgeable with respect to the Lean Cuisine ad.[11]

The flaws in the universe, design and interpretation of defendants' study undermine its probative value, and it deserves no weight in measuring actual confusion over the 1989 advertisement.

### (b) *The Confusing Presentation of the Ads*

Although courts must focus upon "market conditions instead of in-chamber inspections" when determining the existence of actual confusion, courts may combine empirical evidence with visual inspection of the allegedly infringing use as part of this determination. *See, e.g., Charles of the Ritz Group, Ltd. v. Quality King Distributors, Inc.,* 832 F.2d 1317, 1322 (2d Cir. 1987). Further, because both parties' surveys are highly problematic, it is important to examine whether the ads are confusing on their face.

The 1987 advertisement that Stouffer placed in *Parade* magazine carried a large headline with pictures of Lean Cuisine boxes below. The headline read: "Lean Cuisine Entrees Present 25 Ways To Get More Satisfaction From Your Weight Watchers Program," and then in smaller letters, "Weight Watchers Exchanges For Lean Cuisine Entrees." (PX 9) One easily could conclude from reading the ad not only that Lean Cuisine is helping people get more satisfaction from their Weight Watchers program, but also that the Lean Cuisine brand is affiliated with the Weight Watchers program or that Weight Watchers endorses Lean Cuisine entrees.

■ Although this advertisement contains a disclaimer that the exchanges it lists are based solely on published Weight Watchers information, and that the list of exchanges does not imply approval or endorsement of those exchanges by Weight Watchers, this disclaimer appears in minuscule print on the very bottom of the ad. Because of its location and size, the disclaimer does not effectively eliminate the misleading impression conveyed in the ad's large headline.

Disclaimers that emphasize the source of a product often can reduce or eliminate consumer confusion, and have been used by courts as remedies in trademark cases. *See Soltex Polymer Corp. v. Fortex Industries, Inc.,* 832 F.2d 1325, 1328 (2d Cir. 1987); *Berlitz Schools of Languages of America, Inc. v. Everest House,* 619 F.2d 211, 213 (2d Cir.1980). The Court of Appeals has held, however, that each case must be judged by considering the business and its consumers, as well as the proximity of the disclaimer to the infringing statements, and that when disclaimers are used as remedies, the burden is on the infringer to prove that they reduce the likelihood of confusion. *Home Box Office,* 832 F.2d at 1315. *See also Charles of the Ritz,* 832 F.2d at 1324. The Court has noted also that "there is a body of academic literature that questions the effectiveness of disclaimers in preventing consumer confusion as to the source of a product," specifically, an article co-authored by Stouffer's own survey expert, Dr. Jacob Jacoby. *Home Box Office,* 832 F.2d at 1315. *See* Jacoby & Raskoff, *Disclaimers as a Remedy for Trademark Infringement Litigation: More Trouble Than They Are Worth?,* 76 Trademark Rept. 35 (1986).

■ The next advertisement, run in January 1988, carried an even more confusing headline: "Stouffer's presents Weight Watchers exchanges for all 28 Stouffer's Lean Cuisine entrees." (PX 10) The word "presents" in between the marks "Stouffer's" and "Weight Watchers" creates the impression either that Stouffer owns Weight Watchers, or more likely that Stouffer is presenting these exchanges for Weight Watchers—in other words, that Weight Watchers gave Stouffer the exchanges to publish in the ad. This headline is ambiguous on its face and thus threatens a strong likelihood of consumer confusion. *See Home Box Office,* 832 F.2d at 1315; *Cuisinarts, Inc.,* 509 F.Supp. at 1043.

---

11. Although the screener questionnaire asked whether respondents used cigarettes, airlines or long distance services, it did not screen out those who answered these questions negatively. (PX 71–M)

█ Further, the disclaimer for this advertisement not only is printed in small type, but appears below the dotted line that suggests where consumers should cut out the ad if they wish to use it for reference. Thus, a Weight Watchers member who cuts out the ad in order to keep a copy of the exchanges would then consult the ad each time without seeing the disclaimer. Therefore, the disclaimer cannot eliminate the confusion created by the misleading headline.

█ By contrast, the 1989 advertisement (PX 14, 15) is not confusing on its face. The headline does not say that Stouffer's presents Weight Watchers exchanges, or that Stouffer's presents ways to get more satisfaction out of Weight Watchers; it states merely that Stouffer's presents exchanges for Lean Cuisine items "to fit into your Weight Watchers program." By using "exchanges" instead of "Weight Watchers exchanges," Stouffer correctly implies that Stouffer, and not Weight Watchers, calculated the exchanges for its products—an implication confirmed by the disclaimer below. The disclaimer, while in relatively small print on the bottom, appears inside the dotted line surrounding the exchange information, and is in much larger type than the exchange listings themselves.

It is possible that someone completely unfamiliar with Weight Watchers frozen entrees, the Weight Watchers diet plan or any other diet involving exchanges might glance quickly at the ad and conjecture that simply because Stouffer used the Weight Watchers mark in the advertisement, Weight Watchers must have given Stouffer permission to use the trademark, and thus must not disapprove of Stouffer's Lean Cuisine entrees. However, absent a convincing showing of actual confusion, absent a facially confusing or intentionally confusing message, and absent a tipping of the balance one way or another under the *Polaroid* test, the potential for such conjecture cannot justify proscribing advertising that conveys useful information. Further, such conjecture presents a limited potential for damage to plaintiff, as it is unclear how consumers unfamiliar with diet frozen food or the Weight Watchers diet would be affected by a vague notion of connection between Weight Watchers and Lean Cuisine, even if such readers were to consider buying low-calorie frozen entrees.

Although the Lanham Act was designed to prevent a competitor from free-riding on a trademark owner's goodwill and reputation, *see Lois Sportswear*, 799 F.2d at 872, a company cannot use the Act to prevent competitors from ever referring to its trademark. "The registering of a proper noun as a trade-mark does not withdraw it from the language, nor reduce it to the exclusive possession of the registrant which may be jealously guarding against any and all use by others." *Societe Comptoir De L'Industrie Cotonniere Etablissements Boussac v. Alexander's Department Stores, Inc.*, 299 F.2d 33, 36 (2d Cir. 1962).

A finding that the 1989 advertisement infringed the Weight Watchers trademark solely because it used the mark to point out Lean Cuisine's fit into the Weight Watchers program would unduly discourage companies from advertising their products' compatibility with other companies' services or products. "The free flow of information regarding the substitutability of products is valuable to individual consumers and to society collectively, and by providing it a supplier engages in fair competition based on those aspects—for example, price—in which the products differ." *American Home Products*, 656 F.Supp. at 1068. Restricting the ability of companies to provide this information also would circumscribe commercial expression, which "assists consumers and furthers the societal interest in the fullest possible dissemination of information." *Central Hudson Gas v. Public Service Comm. of New York*, 447 U.S. 557, 561–62, 100 S.Ct. 2343, 2349, 65 L.Ed.2d 341 (1980). Of course, companies cannot make untruthful or misleading statements; as discussed below, to the extent that the exchange information listed by Stouffer is consistently out of line with the Weight Watchers system with respect to optional calories, such inaccuracy may not be repeated.

For the above reasons, the 1987 and 1988 advertisements infringe plaintiff's trademark by creating confusion as to source and endorsement, but the 1989 ad does not.[12]

### III.

Weight Watchers claims that these ads constitute false advertising under § 43 of the Lanham Act because: (a) they give the misleading impression that the Lean Cuisine meals are equivalent to or interchangeable with Weight Watchers food products, when in fact Lean Cuisine meals do not "fit into" the Weight Watchers program; (b) the advertisements do not correctly reflect the Weight Watchers exchange system; and (c) although the ads refer to and list Weight Watchers exchanges, the Lean Cuisine packages list American Dietetic Association (ADA) exchanges, which are slightly different. (Pl. Posttrial Mem. at 20–22)

Because the 1987 and 1988 ads already have been found to infringe plaintiff's trademark, it seems unnecessary to consider whether as a result of this infringement they also constitute false advertising as to endorsement or connection. The 1987 and 1988 advertising will be enjoined because it infringes; it need not be enjoined redundantly on the ground that the infringement also misleads.

As set forth in greater detail below, the evidence does not support Weight Watchers' first theory of false advertising with regard to the 1989 advertisement (PX 15), as Lean Cuisine "fits" into the Weight Watchers program, but it does support Weight Watchers' second theory. Although Stouffer's exchanges have been revised to reflect fairly accurately the Weight Watchers exchange system, there

remains a consistent discrepancy in the Stouffer presentation of Weight Watchers exchanges that seems calculated to place Weight Watchers at a competitive disadvantage. Finally, Weight Watchers has failed to prove its third theory of alleged confusion, arising from the use of Weight Watchers exchanges in the ads and ADA exchanges on the Stouffer packages.

### A. *Lean Cuisine's "Fit" Into the Weight Watchers Program*

 Weight Watchers claims that the Lean Cuisine meals do not "fit into" the Weight Watchers program. Stouffer counters that Weight Watchers' own system of measurement for food exchanges in its frozen entrees is not exact, and that Weight Watchers itself uses considerable discretion in its exchange classifications. Stouffer points out that Weight Watchers and Foodways calculate the exchanges in an occasionally arbitrary way, that Weight Watchers itself revised its exchange information prior to bringing this law suit, and that Weight Watchers members have sent letters revealing confusion about the way in which Weight Watchers arrives at exchanges for frozen entrees. (DX HX, HZ, IA, IB, IF, IJ, IK, IL, IS)

Based on the Weight Watchers system of exchanges as provided to Weight Watchers members, the statement that Lean Cuisine entrees "fit" into the Weight Watchers program is not false. Although there may be minor discrepancies between the way Weight Watchers and Stouffer would count the food exchanges of given frozen meals, those differences do not materially affect the ability of consumers to fit Lean Cuisine into their Weight Watchers program.

*Defendant claims also that plaintiff's misuse of its trademark to prevent competition, unclean hands and abuse of process preclude recovery. (Answer ¶¶ 59–60) As is evident from this opinion, plaintiff's alleged misuse of its trademark does not preclude an injunction against the first two advertisements. However, Weight Watchers' alleged misuse of its trademark will be discussed below in connection with Stouffer's counterclaims.*

---

**12.** Stouffer asserted numerous affirmative defenses to Weight Watchers' claims, some of which I have addressed while analyzing the trademark claims here, and some which I have not yet addressed. Most significantly, Stouffer alleges that Weight Watchers is barred by the statute of limitations, laches, estoppel and/or acquiescence from asserting any claim against defendant. There is no basis for a statute of limitations defense in this suit. The laches and estoppel defenses are discussed below in connection with defendants' counterclaims.

The Weight Watchers program encourages variety and flexibility. Most of its recent changes were designed to diversify the program. Thus, the Weight Watchers program has expanded its array of food exchanges, has added the "optional calorie" feature, has provided members with guidance for how to "count" party foods (PX 86–G) and meals in restaurants (PX 86–I), and has expanded its product line of processed foods which comply with the program.

Further, adherence to the Weight Watchers food plan necessarily involves certain levels of approximation. For instance, in measuring a one cup serving of strawberries to meet a "fruit exchange," (PX 86–B at 1), a member may measure the strawberries whole, so as to minimize the amount of food in the exchange, or she may cut the strawberries in quarters, so as to fit more fruit into the cup, or she may cut them into thin slices, thus "squeezing" the most out of the exchange. Members are encouraged to be as precise in their measurements as possible, but there is necessarily an element of approximation. Even the Week One booklet recommends weighing and measuring not as an end in itself, but as a tool "until you become familiar with proper portions." (Pl. Exh. 86–A at 23)

Recognizing that variation is particularly significant when eating out, the Weight Watchers "Dining Out" booklet advises that because "it isn't possible to know the exact ingredients and amounts contained in each dish, and recipes do vary from one restaurant to another our guidelines provide approximate Exchanges. Nor is it possible for you to know precise portion sizes in restaurants. Use your judgment and the discerning eye you've developed these past few weeks while weighing and measuring portions at home." (PX 86–I at 7) By claiming that Lean Cuisine does not fit into the Weight Watchers program, Weight Watchers has simply refused to extend its policy of encouraging variety and flexibility to foods made by competitors of the Weight Watchers brand.

During cross-examination of Ronnie Amster, a Weight Watchers group leader and member services coordinator for Nassau County, a lawyer for Stouffer asked whether frozen foods other than those licensed by Weight Watchers can be eaten under the food plan. Amster first replied: "At the member's own responsibility. Not as fitting into the exchange program." But soon she admitted that a member could eat a frozen prepared meal other than a Weight Watchers meal while on the Weight Watchers plan if "they accept the responsibility for eating that or use the guidelines that are suggested in the dining-out guide." (Tr. 214)

Weight Watchers contends that the exchanges for Lean Cuisine entrees listed in the Stouffer ads do not "fit" into the program because of slight discrepancies between ingredients and the exchanges. However the evidence shows that because food ingredients have mixed nutrient values, one could assign different sets of exchange values to the same product merely by categorizing foods in different ways, and Weight Watchers' own exchanges reflect subjective judgments. Stouffer cannot be expected to calculate exchanges more "accurately" than Weight Watchers itself. Weight Watchers' own nutritional expert witness, Dr. Barbara Levine, conceded that Weight Watchers' calculation of exchanges is not perfect, as "there are minor discrepancies in the comparison of [Weight Watchers'] package listings to the exchange system as presented in the Weight Watchers booklet...." (PX 43–B) For example, she found that Weight Watchers' "Cheese Pizza" entree does not conform to Weight Watchers' stated exchange guidelines because there is no exchange listing to account for the entree's corn oil and soybean oil. Neither is there a fat exchange listed on the box, where oil would ordinarily be classified, nor is the appropriate caloric value of the oil included in an optional calorie tally. (*Id.* at 087013) Nor is the sugar and modified food starch used in the product accounted for in optional calories, the only category under which sugar and cornstarch can be counted. (*Id.*, PX 86–A, Optional Calories List, at 1) Similarly, in Dr. Levine's view, Weight Watchers' "Oven Fried Fish," "Fillet of Fish Au

Gratin" and "Baked Cheese Ravioli" fail to conform precisely to Weight Watchers' stated exchange guidelines. (PX 43–B)

In addition, defendant has compiled a list of foods used in the preparation of Weight Watchers frozen dinners which apparently are not included in the Weight Watchers exchange listing on the package. (DX NQ, NR) For example, in some entrees oil is a listed ingredient, yet no fat exchange listing reflects that oil is included. (Def. Exh. NR) Consumers also have noticed certain discrepancies in their calculations of exchanges from the ingredients or nutritional information on the box and the exchanges listed. (DX HZ—IV) Weight Watchers has written in response that discrepancies between the exchanges listed on the package and the ingredients reflect Weight Watchers' calculation of exchanges based upon an accurate nutrition analysis for every product which complies with the program. In looking at exchanges on the boxes, "one fact to remember is [that] no food item is 100 percent of any one nutrient, such as protein, carbohydrate or fat. All foods are combinations of protein, carbohydrate, fat, water, vitamins, etc." (See DX IJ, IL, IR, IT) Weight Watchers relies on Allen Ho, its manager of license operations, to calculate the exchanges listed on Foodways boxes, and it is up to him to decide under which exchange to list a food item. In December, 1988 and January 1989, Ho reviewed the exchange statements for Weight Watchers frozen entrees and made some changes; for example, he changed the number of optional calories listed for certain entrees. (DX JB, JC) Stouffer has suggested that Weight Watchers made these changes as a result of this litigation, knowing that it would not be in a position to criticize the Lean Cuisine exchanges if Weight Watchers' own exchanges were not accurate. Regardless of the reasons for the review, such a reassessment illustrates at the very least that there may be more than one proper way to classify exchange information for a frozen entree.

Weight Watchers relied heavily in criticizing the Stouffer exchange calculations on Ho, who is the final authority in setting exchange values of frozen meals produced by Weight Watchers licensees. But Ho did not present an objective standard against which his own calculations can be measured. At bottom, Weight Watchers' position amounts to claiming that the only permissible standard for measuring the exchanges in frozen entrees is Allen Ho. However, that conflicts with the entire notion of Weight Watchers as a diet system that its members may use with foods other than those sold under the Weight Watchers name, and with the information Weight Watchers itself provides to its members. In order to generate exchanges that "fit" the Weight Watchers program, Stouffer need not calculate the exchanges exactly as Allen Ho would calculate them; this would be an impossible feat, as Lean Cuisine does not have access to Weight Watchers' recipes, which are trade secrets, and thus does not know how Weight Watchers calculates exchanges on the products its franchisees produce from secret recipes. Nor does Stouffer have access to Allen Ho. What Stouffer must do, however, in order to "present exchanges ... to fit into your Weight Watchers Program" without being misleading is to apply all the elements of the Weight Watchers system made available to Weight Watchers members, and calculate exchanges under that system as accurately as would a scrupulous adherent to that system. Except as set forth below, Stouffer has done so.

### B. *The Accuracy of Stouffer's Exchange Information*

Stouffer's calculation of the six major exchange groups appears in general to be accurate, and in most entrees all ingredients seem to be accounted for under exchange categories. However, what Stouffer cannot do with impunity is to put itself at a competitive advantage by excluding categories used by Weight Watchers and manipulating its exchanges to seem more attractive to Weight Watchers members. In one respect, optional calories, that is what it has done. Stouffer has not listed optional calories for entrees containing ingredients, such as sour cream, that can be

listed only as optional calories under the Weight Watchers system. DeAnne Hrabak, a nutritionist for Stouffer who calculated the exchanges for Lean Cuisine products testified that it was not necessary to put optional calories into the advertisements because—except for amounts of optional calorie food which were too insignificant to be counted—all food in the Lean Cuisine products was accounted for as an exchange when the Weight Watchers program allowed that food to be listed as either an exchange or an optional calorie food. (Tr. 991–999, 1097, 1104, 1133) In other words, many of the food items listed as optional calories are listed also on the exchange lists; so, for example, Hrabak did not list the flour in a Lean Cuisine meal as optional calories because she instead counted it as a bread exchange according to the Weight Watcher guidelines in the Week 5 booklet. (Tr. 994; See PX 86–E at 7) This is acceptable, because it accounts for all ingredients.

Hrabak said also, however, that when foods that could be counted only as optional calories, such as sour cream, were used in the Lean Cuisine recipes, they were in amounts much smaller than the amounts listed in the Weight Watchers published materials as calling for a calculation of optional calories. Considering the low number of calories in each entree, this statement sounds correct insofar as the additional few calories would not be significant. Nevertheless, just because certain optional calorie food is listed in the Weight Watchers booklet as a "100 Calorie Food" does not mean that even a far smaller amount should not be listed as 10 or 15 optional calories; indeed, these are the amounts in which Weight Watchers lists optional calories on its own brand of food.

Stouffer's calculation of exchanges for its 1989 advertisement by giving all nutrients a value in exchanges, thereby excluding optional calories, mirrors the way in which Weight Watchers shifted nutrients from one exchange to another before this litigation began. In fact, Dr. Levine criticizes the exchange listings in the February 1989 ad in much the way that she and Stouffer have criticized the categoriza-

tion of Weight Watchers entrees. Levine argues that the Lean Cuisine exchange listings fail adequately to reflect optional calories and fat exchanges. (Pl. Exh. 43–D) Weight Watchers does include optional calorie listings—usually of about 10 calories—in the exchange information on its packages. (DX JG)

The evidence suggests that Stouffer manipulated its presentation of optional calories for competitive advantage. Defendant for years has distributed booklets providing nutrition and diet exchange information for Lean Cuisine entrees. (DX I, J, and K) The 1984 booklet (DX I) shows optional calories for frozen entrees under the Weight Watchers exchange system. In the two subsequent revisions, however, (DX J and K) the optional calorie tally was omitted, often when there was no apparent change in the recipe for the relevant entree. For example, "Filet of Fish Florentine" in 1984 was described as having "3 protein exchanges, 1 vegetable exchange, ½ milk exchange and 15 optional calories." The serving size was described as 9 oz. and it contained 240 calories. (DX I at 201753) In the 1986 booklet, and in the 1989 ad, this entree was the same serving size and had the same number of total calories, but no optional calories were listed. (DX K at 201815) Stouffer apparently did not change "Spaghetti with Beef and Mushroom Sauce," or "Beef & Pork Cannelloni with Mornay Sauce," but here again omitted classification of optional calories in the most recent exchange information.

Further, a few of the Lean Cuisine entrees contain sour cream or wine, foods which cannot be listed as exchanges and thus should have been counted as optional calories. As discussed above, Hrabak explained that these ingredients were added in such small portions that they are insignificant. (Tr. 993–999) Nonetheless, by omitting the optional calories in these entrees, Stouffer has failed to give Weight Watchers members the same information Weight Watchers would when describing its own products.

Stouffer should include optional calorie listings when optional calorie foods—that

is, foods that do not fall under any exchange except optional calories—are used. Otherwise, the exchange information will seem deceptively more attractive to Weight Watchers members who do not wish to use up their optional calorie quota.

### B. *ADA vs. Weight Watchers Exchanges*

■ Finally, plaintiff rests a false advertising claim on the advertisements' misleading implication, when combined with the Lean Cuisine boxes, that the Weight Watchers exchanges given in the ad are identical to the exchanges listed on Lean Cuisine boxes. In fact, the exchanges listed on the boxes are based upon an exchange system used by the American Diabetes Association and the American Dietetic Association (ADA), while the exchanges listed in the ads are supposedly based upon the Weight Watchers exchange system. Stouffer asserts that the ADA exchanges and the Weight Watchers exchanges are virtually identical, and that by using the ADA exchanges under its own mark, Weight Watchers in effect is preventing others from using a well-established system of dieting. This contention will be discussed in the counterclaim section below; for the purpose of this false advertising claim, it can be assumed that the ADA exchanges and the Weight Watchers exchanges are different, because Weight Watchers—and thus Weight Watchers members—consider them to be different, and therefore these members would not want to be misled into confusing the two. The listing of Weight Watchers exchanges in the ads and ADA exchanges on the boxes has the potential to confuse and mislead consumers; it is quite conceivable that consumers will see the ads, buy Lean Cuisine entrees and use the exchange information on the packages without realizing that the exchanges on the boxes are not Weight Watchers exchanges. Nevertheless, plaintiff has failed to prove a false advertising claim based on this aspect of the ads because it has failed to offer any evidence of actual confusion.

When a merchandising statement or representation is literally or explicitly false, plaintiff may prevail even without proof of the advertisement's impact on the buying public. *Coca–Cola Co.*, 690 F.2d at 317; *American Home Products Corp. v. Johnson & Johnson*, 577 F.2d 160, 165 (2d Cir. 1978). If the advertisement, however, is implicitly rather than explicitly false, plaintiff can show false advertising under the Lanham Act only by presenting evidence that the public was misled, confused or deceived by the statement at issue. *Coca–Cola*, 690 F.2d at 317. The alleged misrepresentations must relate to an inherent quality or characteristic of the other product. *See Vidal Sassoon, Inc. v. Bristol–Meyers Co.*, 661 F.2d 272, 278 (2d Cir.1981).

Although the exchange system constitutes an inherent quality or characteristic of the Weight Watchers program, and therefore can be the basis for a false advertising claim, the alleged misrepresentation that the exchanges are the same on the boxes and the ads is implicit rather than explicit. The 1987 and 1988 ads state, in the copy, that consumers should "look on the back of Lean Cuisine packages for ADA diet exchanges," and explain in a footnote that the ADA exchanges are based on diet exchanges provided by the American Diabetes Association, Inc. and The American Dietetic Association. (PX 9, 10) The 1989 ad refers to the ADA exchanges on the boxes outside the dotted line where consumers are supposed to cut out the exchange information, although there is a footnote inside the line that explains that "Diet exchange calculations on package backs are based on Exchange Lists for Meal Planning [copyright] American Diabetes Association, Inc., and The American Dietetic Association." Therefore, confusion over the exchanges listed in the ads and those listed on the boxes, if any, will result not from explicitly false representations about which exchanges are referred to in the advertisements or on the boxes, but from an inference people might draw after having seen the ad—but without having it in front of them in the supermarket—that the exchanges on the box must be the same as those in the ad.

Plaintiff has presented no evidence that consumers used the exchange information on the Lean Cuisine packages as part of their Weight Watchers program because they were misled by the ads into thinking that the exchange information on the packages would fit into their Weight Watchers Diet. Nor did plaintiff's market survey test consumers' perceptions of the exchanges given in the ad and those on the boxes. Therefore, plaintiff has failed to prove its false advertising claim under the Lanham Act.

For the above reasons, I find that the statement in the Stouffer advertisements at issue that the Lean Cuisine entrees fit into the Weight Watchers program is not false. The 1989 ad constitutes false advertising only insofar as the exchange information does not include optional calories for certain entrees containing optional calorie ingredients, and Stouffer therefore is enjoined from running advertisements that do not contain optional calorie information. Because the 1989 ad includes listings for such foods as optional meats, cheese and tomato puree, which were not included in the previous advertisements, and because the 1989 ad has modified the exchange information in the 1987 and 1988 ads, I infer that Stouffer would not revert to any such omissions and alleged errors that appeared in the 1987 and 1988 ads, and therefore it is unnecessary to fashion a remedy with respect to such omissions and alleged errors.[13]

## IV.

Plaintiff asserts three claims under New York law. For the reasons set forth below, it has failed to prove any of them.

### A. *Unfair Competition*

Plaintiff asserts that defendants' advertisements and promotional material violated the common law of unfair competition because they misappropriated plaintiff's mark and used it to misrepresent the source of defendants' goods. Although plaintiff uses the phrase "palming off" (Pl. Pre–Trial Mem. at 25), this case does not involved one party's attempt to pass off its goods as those of another, which until recently was the only basis upon which a party could base an unfair competition claim. *See American Footwear Corp. v. General Footwear Corp.*, 609 F.2d 655, 662 (2d Cir.1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980). Now, however, unfair competition encompasses "a broader range of unfair practices which may be generally described as a misappropriation of the skill, expenditures, and labor of another." *American Footwear*, 609 F.2d at 662. This includes misappropriating the goodwill of another company by misleading the public as to sponsorship or endorsement, as well as explicitly misrepresenting the source of the product.[14] *See Ideal Toy Corp. v. Kenner Products Div. of General Mills Fun Group, Inc.*, 443 F.Supp. 291, 305–09 (S.D.N.Y.1977). Because I have found with regard to the Lanham Act claim that plaintiff has not proved likelihood of confusion in connection with the 1989 ad, either as to the source of the goods advertised or sponsorship, plaintiff's unfair competition claim fails as to the 1989 ad.

It is unnecessary to determine whether Stouffer's actions in connection with the 1987 and 1988 ads, which infringed plaintiff's trademark because of the likelihood that they would confuse consumers as to source or endorsement, also constitute common law unfair competition. Common law unfair competition claims closely parallel Lanham Act unfair competition claims; to the extent that they may be different, the state law claim may require an additional element of bad faith or intent. *See Sarato-*

---

13. As set forth below in Section VI, Stouffer is enjoined from publishing the 1987 and 1988 ads insofar as their copy infringes plaintiff's trademark. That injunction is independent of any issue relating to their exchange content.

14. In New York unfair competition cases, courts have placed emphasis also on the existence of secondary meaning in the mark and/or defendant's predatory intent. *See American Footwear*, 609 F.2d at 662. As discussed above, there is substantial secondary meaning in the Weight Watchers mark, but Stouffer's conduct does not reflect predatory intent.

*ga Vichy Spring Co., Inc. v. Lehman,* 625 F.2d 1037, 1044 (2d Cir.1980). As discussed below, the only remedy to which plaintiff is entitled here is an injunction, and Stouffer already is enjoined from publishing these ads based on federal law. To the extent that this injunction may be found improper, an injunction based on state law also would be improper. Therefore, it is unnecessary to reach this state law claim as to the 1987 and 1988 ads.

**B.** *Dilution*

■ Plaintiff claims also that Stouffer's use of the Weight Watchers trademark violated New York's anti-dilution statute, N.Y. Gen.Bus.Law § 368–d, which provides:

"Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services."

The New York Court of Appeals has explained that the

"evil which the Legislature sought to remedy was not public confusion caused by similar products or services sold by competitors, but a cancer-like growth of dissimilar products or services which feeds upon the business reputation of an established distinctive trademark or name.

*Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 544, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977). Thus, this statute protects companies' distinctive marks from the blurring or dilution that results when the mark is used on dissimilar, non-competing products. The statute would protect against such diluting uses as "Dupont shoes, Buick aspirin tablets, Schlitz varnish, Kodak pianos, [and] Bulova gowns." 1954 N.Y.Legis. Annual 49, *quoted in Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621, 625 (2d Cir.

1983). The statute was not meant, however, to extend to cases where the defendant is a direct competitor selling similar products. *See Business Trends Analysts v. Freedonia Group, Inc.,* 650 F.Supp. 1452, 1458 (S.D.N.Y.1987) (Weinfeld, J.); *Smithkline Beckman Corp. v. Proctor & Gamble Co.,* 591 F.Supp. 1229, 1246–47 (N.D.N.Y.1984), *aff'd mem.,* 755 F.2d 914 (2d Cir.1985); *Aris–Isotoner Gloves, Inc. v. Fownes Bros. & Co., Inc.,* 594 F.Supp. 15, 24 (S.D.N.Y.1983). *But see Sage Realty Corp. v. Sage Group, Inc.,* 711 F.Supp. 134, 142 (S.D.N.Y.1989); *Lesportsac, Inc. v. K Mart Corp.,* 617 F.Supp. 316, 317 (E.D.N.Y.1985); *Vitabiotics, Ltd. v. Krupka,* 606 F.Supp. 779, 784–85 (E.D.N.Y. 1984).

Because Stouffer and Weight Watchers compete directly in the frozen food market with strikingly similar products, plaintiff lacks standing to sue under N.Y.Gen. Bus.Law § 368–d. Accordingly, this claim is dismissed.

**C.** *Deceptive Trade Practices*

■ Plaintiff claims that by creating the impression through their ads that Weight Watchers sponsored Stouffer products, or that Weight Watchers calculated the exchanges listed in the ads, defendants engaged in deceptive acts and practices under N.Y.Gen.Bus.Law § 349.[15] This statute provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." N.Y.Gen.Bus.Law § 349(a). The law empowers the attorney general to sue companies on behalf of the state, but also allows any person "who has been injured by reason of any violation of this section" to sue to enjoin the unlawful act or practice, and to recover the greater of actual damages or 50 dollars. N.Y.Gen. Bus.Law § 349(h).

Defendants argue that as a competitor and not a consumer, plaintiff does not have standing to sue under § 349. It is true, as Judge Weinfeld noted in *Genesco Enter-*

---

**15.** Another section of the consumer protection statute, N.Y.Gen.Bus.Law § 350 and § 350–d prohibit false advertising. Plaintiff did not assert a claim under these sections.

*tainment v. Koch,* 593 F.Supp. 743, 751 (S.D.N.Y.1984), that "Section 349 wears its purpose on its face; it is entitled 'Consumer Protection From Unfair Acts and Practices.'" However, *Genesco* did not hold that standing should be limited to consumers. In finding that private transactions without ramifications for the public at large were not a proper basis for suit under this section, Judge Weinfeld focused upon the public nature of the claim, rather than the status of the plaintiff. *Construction Technology, Inc. v. Lockformer Co., Inc.,* 704 F.Supp. 1212, 1222 (S.D.N.Y. 1989). Therefore, competitors may have standing to sue, so long as some harm to the public at large is at issue. "While the statute does not preclude an action by one business against another, the gravamen of the complaint must be consumer injury or harm to the public interest." *AZBY Brokerage, Inc. v. Allstate Ins. Co.,* 681 F.Supp. 1084, 1089 n. 6 (S.D.N.Y.1988).

Here, the false advertising involving diet and food that Stouffer allegedly conducted clearly would involve a public harm if proved. Yet, although Weight Watchers may bring this claim, it cannot satisfy the necessary elements to prevail. Section 349(h) provides that a private party may bring a claim if it has been "injured by reason of any violation of this section." Although Weight Watchers has shown that the advertisements were misleading, it has failed to show either that Stouffer profited from these ads, or that plaintiff was damaged. Therefore, plaintiff has not proved its claim under the consumer protection statute.

## V.

Stouffer asserts two main counterclaims: (1) Weight Watchers has misused its trademark to prevent competition and has engaged in other unfair acts in violation of the Lanham Act, Ohio law, and N.Y.Gen. Bus.Law § 349; and (2) Weight Watchers has engaged in false advertising under § 43(a) of the Lanham Act and injurious

falsehood under the common law by misrepresenting the uniqueness of its food plan and disparaging Stouffer's Lean Cuisine to Weight Watchers members. These counterclaims—from the claim that Weight Watchers would not allow Stouffer to advertise in Weight Watchers Magazine to the contention that Weight Watchers is deceitful when it "guarantees" its products [16]—boil down to the same underlying contention: Weight Watchers uses its influence over its members to sell its branded products and to steer its members away from competitors' products. That Weight Watchers actually employs this marketing strategy reveals only that Weight Watchers—and more specifically, its parent company, Heinz—is interested in the bottom line just like any other company. Its tactics, though opportunistic, do not qualify as deceptive, unfairly predatory, or monopolistic. Most important, if Stouffer can make non-deceptive statements in advertising about its products' fit into the Weight Watchers program, then Weight Watchers can refute these statements in the marketplace if it also does so in a non-deceptive manner. Weight Watchers' ability to influence its members should not be held against the company to burden this right.

First, defendant claims that Foodways' Weight Watchers brand frozen entree packages constitute false advertising, because the exchange information on the packages is not necessarily accurate, and the statement on the packages that the entrees fit the Weight Watchers program is intentionally misleading. Yet, the only representation Foodways makes on these packages, besides listing the exchanges, is that "This product was prepared to fit the Weight Watchers Program and is useful for weight control when used strictly in accordance with the Weight Watchers food plan." (DX JG) It not only is silly for Stouffer to try to prevent Weight Watchers from making this benign statement, but it is also impossible in view of the finding sought by Stouffer and discussed exten-

16. Stouffer's counterclaim that Weight Watchers has unfairly precluded fair use of the term "Weight Watchers" need not be addressed because this opinion allows Stouffer to use the phrase "Weight Watchers" in a non-confusing manner.

sively above that even Lean Cuisine could "fit into" the Weight Watchers program.

 Second, Stouffer grounds claims of unfair competition and injurious falsehood on letters—specifically one signed by Berger—sent by Weight Watchers to franchisees and members alerting them to the Lean Cuisine ads. Stouffer describes these letters as false and misleading, but Weight Watchers' statement to members that it can "stand behind" only its own products is not explicitly false, because in fact Weight Watchers does not have a duty to analyze other companies' products.

The thrust of the letters at issue was to emphasize Weight Watchers' policy for responding to members' concerns about processed diet foods made by other companies: "Weight Watchers does not stand behind the information statement on any brand of food except its own. We do not dispute or confirm the accuracy of any statement by any other manufacturer. Therefore, when it comes to these products, the member must use her/his own judgment." (DX BC)

Although Stouffer argues that the statement is false on its face because Weight Watchers exchanges are not in fact accurate, Stouffer cannot have its (diet) cake and eat it too: if it wants to argue that all exchanges are approximate and that the exchanges it has calculated fit into the Weight Watchers program, it cannot turn around and accuse Weight Watchers of calculating inaccurate exchanges when the alleged inaccuracies are no greater than its own. Further, Stouffer alleges that this statement *implies* that only Weight Watchers creates accurate or correct exchanges for its diet program, and thus uses its mark to certify exchange information or food and prevent the competition from using the exchange system. (Tr. 1349–53) Stouffer presents no evidence that consumers interpret the statement as implying that only Weight Watchers exchanges are correct, and therefore has not proved false advertising as to that statement. *Coca-Cola*, 690 F.2d at 317.

The Berger letter's criticisms of the exchanges listed in the 1988 ad—such as the absence of optional calories and certain limited vegetable exchanges—are not materially false, as these disparities did exist in the exchanges Stouffer listed. Berger did not say that Lean Cuisine could not "fit into" the Weight Watchers program; he wrote instead that Stouffer incorrectly represented the "Weight Watchers Exchanges" by failing to include certain exchanges. He wrote this letter before Stouffer changed its ad to list limited meat selections, semisoft/hard cheese and tomato puree. As discussed above, the absence of optional calorie calculations renders these exchanges at least partially false. It therefore was not misleading for plaintiff to tell its members that the Stouffer ad incorrectly represented Weight Watchers exchanges.

Stouffer also has not proved that Weight Watchers committed the common law tort of injurious falsehood. A defendant commits "injurious falsehood" when it publishes a false statement harmful to the pecuniary interests of plaintiff, with intent to deceive and with knowledge of the statement's falsity or with reckless disregard for the truth of the statement. *Restatement (Second) of Torts* § 623(A). There is no evidence here that Berger or Weight Watchers made a false statement about the Stouffer advertisements with an intent to deceive.

 Stouffer alleges also that, in effect, Weight Watchers has deceived its members and the United States Postal Service by representing itself as a service organization dedicated to the health and well-being of its members when in fact its real purpose is to make money for Heinz. It has submitted evidence that *Weight Watchers Magazine*, which is published by Weight Watchers TwentyFirst Corp., refused to accept advertisements for Lean Cuisine frozen entrees, and argues that this refusal is unfair and violates postal regulations conferring second class rates on materials published "for the purpose of disseminating information of a public character, or devoted to literature, the sciences, art or some other special industry." 39 CFR Pt. 3001, Subpt. C, App. A.

This claim is not convincing. It is not unusual for a company that markets a product and owns a magazine to reject a competitor's ads. *See, e.g., Twin Laboratories, Inc. v. Weider Health & Fitness,* 720 F.Supp. 31 (S.D.N.Y.1989), *aff'd,* 900 F.2d 566 (2d Cir.1990). Stouffer has not explained how the magazine's rejection of the ads constitutes unfair competition. Stouffer's sales figures demonstrate that the magazine is not essential to Stouffer's ability to compete. Whether or not Weight Watchers is abusing its second class mailing privileges does not relate to an unfair competition claim, and should be dealt with by the Postal Service and not by this court.

■ Finally, Stouffer asserts numerous affirmative defenses, including laches and estoppel and acquiescence. As to the laches, estoppel and acquiescence claims, Stouffer argues that plaintiff did not complain or take any action with regard to the ads for a long time, and that Stouffer in fact had been publishing "Weight Watchers Exchanges" since 1981. Stouffer claims that plaintiff's delay harmed Stouffer because it expanded and developed its advertising program thinking there was no opposition. (Def.Mem. at 22) To prove a laches defense in a trademark case, defendant must show that "plaintiff had knowledge of defendant's use of its marks, that plaintiff inexcusably delayed in taking action with respect thereto, and that defendant will be prejudiced by permitting plaintiff inequitably to assert its rights at this time." *See Cuban Cigar Brands N.V. v. Upmann International, Inc.,* 457 F.Supp. 1090, 1096 (S.D.N.Y.1978) (Weinfeld, J.), *aff'd mem.,* 607 F.2d 995 (2d Cir.1979). That defendant continued to spend money on advertising which exploited the Weight Watchers mark is not prejudicial reliance. Defendant has offered no evidence that it was harmed more than it was helped by Weight Watcher's insignificant delay in bringing this action. Therefore, it cannot prevail on its laches defense.

Further, plaintiff's prior knowledge that Stouffer had been providing Weight Watchers exchanges to consumers who sent away for them does not bar it from suing on the advertisements. The potential impact of the advertisements obviously was much greater than the impact of pamphlets sent in response to individual requests; plaintiff's judgment that the publications available by mail were not worth the hassle of a lawsuit does not constitute estoppel or acquiescence.

For the above reasons, defendant's counterclaims and affirmative defenses are dismissed.

## VI.

■ Plaintiff requests both injunctive and monetary relief; it asks for a broad injunction against any use of the Weight Watchers mark in connection with any dietary exchange information, and against representing that defendants' products are equivalent to or fit into or are interchangeable with Weight Watchers exchanges or diet program. It asks also for a judgment ordering defendants to destroy all infringing advertising material, to account for and pay all profits from the allegedly infringing acts and to pay costs and attorneys' fees. I have found trademark infringement only as to the first two advertisements, on the basis of these advertisements' confusing use of the mark "Weight Watchers." Further, I have found false advertising in the 1989 ad only as to certain exchange information, and not as to claims of "fit" in the ad copy. Accordingly there is no basis to enjoin defendants from ever using the "Weight Watchers" mark, nor from stating that Stouffer's Lean Cuisine products fit into the Weight Watchers program, for reasons discussed extensively in this opinion. As discussed above, Weight Watchers is entitled only to the limited remedy of an injunction against Stouffer ads that do not include optional calories in the exchange data.

Defendants are enjoined, however, from publishing the 1987 and 1988 advertisements. Under the Lanham Act, the issuance of an injunction requires neither demonstration of actual consumer confusion stemming from the infringement, nor actual injury to plaintiff. *Vuitton et Fils, S.A. v. Crown Handbags,* 492 F.Supp.

1071, 1077 (S.D.N.Y.1979), *aff'd mem.*, 622 F.2d 577 (2d Cir.1980). The mere likelihood of such injury is sufficient to warrant an injunction. *Monsanto Chemical Co. v. Perfect Fit Mfg. Co., Inc.*, 349 F.2d 389, 392 (2d Cir.1965), *cert. denied*, 383 U.S. 942, 86 S.Ct. 1195, 16 L.Ed.2d 206 (1966), *quoted in Vuitton et Fils*, 492 F.Supp. at 1077. As discussed at length above, the two earlier advertisements use the "Weight Watchers" mark in a potentially confusing manner, and are misleading because of their errors in accurately presenting the dietary exchanges for Lean Cuisine entrees.

Although this constitutes a finding of likelihood of confusion, it is important to consider the well-settled doctrine that the "grant of injunctive relief depends upon whether such relief is necessary as a matter of equity to relieve against threatened further violations." *Menendez v. Saks and Co.*, 485 F.2d 1355, 1375 (2d Cir.1973), *rev'd on other grounds*, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976). Thus, a permanent injunction is proper only when there is a likelihood not only that consumers could have been misled in the past, but that consumers will be misled in the future. *See Burndy Corp. v. Teledyne Industries, Inc.*, 748 F.2d 767, 772 (2d Cir.1984). That these ads were published two years ago, and have been replaced by a non-deceptive, non-infringing advertisement would suggest that defendants do not intend to publish these ads in the future, and that injunctive relief is therefore unnecessary. Nonetheless, defendants have not promised to refrain from publishing the infringing 1987 and 1988 ads, or any substantially similar ad [17]; indeed, their position throughout this suit has been that the ads were not infringing or misleading. There is thus a small possibility of future harm, and plaintiffs are entitled to an injunction prohibiting publication of the two infringing advertisements. *See, e.g., National Geographic Society v. Conde Nast Publications, Inc.*, 687 F.Supp. 106, 110 (S.D.N.Y.1988).

Plaintiff asks also for an accounting and payment of any profits to defendants from their infringing acts. Such relief is denied, because as discussed below, the circumstances of this case do not merit an accounting under 15 U.S.C. § 1117(a). Further, plaintiff has not adequately shown actual confusion—and thus actual damages—caused by the first two advertisements. Consequently, the only remedy for trademark infringement and false advertising in the 1987 and 1988 advertisements will be injunctive.

Section 1117(a) of the Lanham Act governs damage awards for infringement of a registered trademark. It provides, in part, that when a violation has been shown,

> "plaintiff shall be entitled ... subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party."

15 U.S.C. § 1117(a).

A defendant's infringement of plaintiff's trademark does not automatically entitle plaintiff to an accounting. *Cuisinarts*, 580 F.Supp. at 636 (citing *Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 67 S.Ct.

---

**17.** A substantially similar infringing ad would be one using the same or a similarly worded headline, but substituting the current number of Lean Cuisine entrees on the market.

1136, 91 L.Ed. 1386 (1947)). Rather, an accounting is appropriate if defendant "is unjustly enriched, if the plaintiff sustained damages from the infringement, or if an accounting is necessary to deter a willful infringer from doing so again." *W.E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 664 (2d Cir.1970). Here, plaintiff did not present evidence that it sustained damages from the publication of the infringing ads, as plaintiff's survey evidence of actual consumer confusion was substantially flawed. Further, plaintiff presented no evidence of actual money damages sustained.

The only other bases for granting an accounting, therefore, would be defendants' unjust enrichment or bad faith. Stouffer would have been unjustly enriched if its sales of Lean Cuisine items were attributable to its infringing use of the Weight Watchers name in its 1987 and 1988 ads. *See Bassett*, 435 F.2d at 664. The burden of proving the amount attributable to defendants' wrongful conduct falls on plaintiff, who must "demonstrate the basis for his recovery with specificity." *Vuitton et Fils*, 492 F.Supp. at 1077. *See Burndy Corp.*, 748 F.2d at 772. Although it is possible that consumers bought Lean Cuisine entrees solely because they were misled by the ads into thinking that Weight Watchers endorsed these food items, plaintiff has introduced no evidence of such sales, and has not proved unjust enrichment. Nor do I find that defendants deliberately violated the law when they published the ads at issue. "An accounting for profits is not appropriate where the infringer, while in a judge's eyes having violated the statute, nonetheless acted in good faith." *Cuisinarts*, 580 F.Supp. at 640.

Finally, plaintiff cannot recover attorneys' fees, which under § 1117 of the Lanham Act a court may award only in "exceptional cases." Exceptional cases are those where acts of infringement "can be characterized as 'malicious,' 'fraudulent,' 'deliberate,' or 'willful.'" Sen.Rep. No. 93–1400, 93rd Cong., 2d Sess. (1974), *reprinted in* (1974) U.S.Code Cong. and Admin.News pp. 7132, 7135, *quoted in Vuitton et Fils*, 492 F.Supp. at 1078. This is not such a case.

\* \* \*

For the above reasons, plaintiff proved at trial that defendant infringed its registered trademark in advertisements it published in 1987 and 1988. Plaintiff failed to prove that defendant violated trademark laws in connection with the most recent ad at issue in this case, published in 1989. Because the first two ads were misleading, plaintiff also prevails on its false advertising claim as to these ads. But plaintiff failed to prove that the statement in the advertisements claiming that Lean Cuisine entrees fit into the Weight Watchers program is false, and failed to prove that the combination of listing ADA exchanges on Lean Cuisine boxes and Weight Watchers exchanges in the ad was misleading. Plaintiff did prove that exchanges given for some of the Lean Cuisine entrees in the advertisements, including the 1989 ad, were not accurate. Plaintiff failed to prove any of its state law claims.

Defendants failed to prove any of their counterclaims.

The above shall constitute my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). The injunctive remedies discussed elsewhere in this opinion will be applied. The parties will submit a mutually satisfactory judgment within 10 days, failing which either party may settle a judgment on 10 days notice.

SO ORDERED.